Radisson Collet Alice Mercado On behalf of Appellate Hew and Holly Qualls, the court will forgive me. I'm battling a cold, so my voice isn't all here. Pull the mic as close to you as you possibly can. I'll try to lean forward. I'm a little short also. I'd like to reserve some rebuttal time, and I will keep an eye on the clock as well. The issue before the court in this case is whether the district court erred in granting summary judgment to Mineral County School District and Appellee Stephen Cook, its superintendent, on Mr. Qualls' claim of violation of his due process rights. We submit that it was error for the district court to grant summary judgment in this case because there were several material issues of fact that were in dispute, not the least of which whether Mr. Cook had any basis for initially seeking Mr. Qualls' removal and subsequently suspending him and then subsequently recommending his termination, although he had no basis for that on November 7th of 2002 when he took those actions. We submit that the reason that he did it, based on the testimony of the then board president, was that Mr. Qualls was going to be a scapegoat for an issue that had arisen between two high school students. Mr. Qualls' Mr. Cook's decision to terminate was not to further a legitimate interest, as the district court found in this case. This is a case where the facts are intense. There are several, several facts and many issues that arise from them, but it's also a case that aren't in dispute include the fact that a 19-year-old student had sex with a 14-year-old student in a bathroom adjacent to or part of a cafeteria. Is that correct? That's correct, Your Honor. I have to tell you, as the father of a 14-year-old girl, as a parent of two students in high school, I think it's hard to escape the inference that there are going to be parents concerned about that fact. And that by itself suggests that the school district needed to take some kind of action. And it did, Your Honor. In fact, one of the things that happened was that when the deputies found out about it, that there's no issue that Mr. Qualls did not know about anything going on with these students before the actual issue came out. There were other teachers who knew that these students had been dating. There were other counselors who had been aware of the relationship before Mr. Qualls ever found out, but it all landed on Mr. Qualls, presumably because he was the side administrator of the cafeteria. However, as Mr. Qualls testified, in the prior instance when he was working at the school district, the principal of the high school was responsible for the high school students. This isn't a case where the high school principal or the principal of the cafeteria had prior knowledge of something that was going on and did nothing about it. Now, once the incident came to light, there was some question whether it was true, whether it was not true. The counselor that first found out about it, she found out about it through a rumor from another student at the high school. She didn't do anything about it because she says, well, it's just a rumor, there's no basis to it, and then later heard something else that caused her to report it to the Monroe County Sheriff's Department. Now, let me try it this way. 1983 isn't a catch-all, something's unfair statute. Your claim turns on a denial of due process. That's correct, Your Honor. Exactly what process do you contend was due and not made available to your client at what point in time? I think the very first deprivation was on November 7th when Mr. Qualls was removed from his position as the principal of the high school. Now, at that time he was suspended with pay, is that correct? He was just, well, he was police on administrative leave with pay. Okay. At that point, Mr. Cook's testimony is that Mr. Qualls had done nothing wrong. There were no allegations against him at that point, and so there was no indication that at that point Mr. Qualls had any idea, any prior notice of the incident involving these students. Now, that's Mr. Cook's testimony. Notwithstanding that, he takes Mr. Qualls out of his position. He claims it was to preserve the integrity of an investigation, but at that point Mr. Cook already knew that the investigation was over. A couple of days before Mr. Qualls was even interviewed, they had taken, they had met the board president, a board member, Mr. Qualls, and the investigator and had decided that Mr. Cook, Mr. Qualls had to leave. That he was going to be the way that they were going to deflect responsibility or liability away from the school district. But the report, the Bellerin Associates report, it looked like had been done, though not finalized, or that the investigation had been done, and that Mr. Cook was relying at least in part on that information. Plus, there was a letter, I guess, on October 30th to Mr. Qualls indicating that he was the subject of an investigation. Why isn't that enough notice to Mr. Qualls that he is the subject of an investigation and then the report from the investigator suggests there's an issue of concern relating to Mr. Qualls? I think the biggest reason, Your Honor, is because Mr. Cook was involved with the investigation with Mr. Scott, who did the Bellerin report. He had been involved at every step of the way. He had written to the board and told them it's an independent investigation. I have nothing to do with it. But his testimony reflected that he was gathering information, that he was giving it to Mr. Scott, and that they had already decided that Scott was going to leave no matter what he said. I mean, that Mr. Qualls was going to leave no matter what he said. Well, it didn't turn out that way. Well, sure it did. Because one of the things that the Bellerin report accused Mr. Qualls of was being and then he said he didn't supervise. As it turned out, what Mr. Scott did is he misinterpreted the evidence. He also accused Mr. Qualls of having prior knowledge that several people had told him that this kid was a problem and there was a problem at the cafeteria. That turned out to be false. He claimed that several people had talked to Mr. Qualls about these kids having a relationship before. That turned out to be false. If you keep telling me that turned out, you can't escape the fact that it turned out to be false, was demonstrated as such, and your client was reinstated to his position. Well, I think the problem, Your Honor, is that he was removed from his position publicly and in a humiliating manner without having done anything wrong. Now, if the school district has an interest to protect, then the subject of the investigation was not just Mr. Qualls. According to Mr. Cook's testimony, it was also Clyde Baker, the principal of the high school. It was also Chrissy Smith, the high school counselor. But nothing happened to any of those people. So you're telling me the due process requires everybody be abused in the same fashion? I got to tell you, I look at the big picture here. There's an incident which it seems to me screams out for investigation and some reason for concern. Now, you can argue the wrong person has made the subject of the investigation. But if he's, in fact, the principal of the school where the cafeteria is located, and there does seem to be some acknowledgment they heard rumors before about the 19-year-old, then it seems to me there's at least some reason to think, okay, we need to look more closely at this. At the date you cite in November, he's put on administrative leave with pay, so he's not, in fact, deprived of some piece of property. Two months later, he is put on, I guess, suspension or whatever, I've forgotten the terminology. At that time, he is going to lose his pay but for the posting of a bond, which he does. Sometime after that, there's a hearing, a fuller hearing, evidence gathered and so forth. And the result of that is largely the exoneration of your client and his reinstatement after he's cited for certain things but no further suspension is imposed. Isn't that how the process is supposed to work? You go at it incrementally. Well, if we go back to the process on November 7th, there was no basis for the removal of Mr. Qualls under the statutes of the Nevada due process. In order for the amendment to take place. He wasn't being removed at that stage. He was put on administrative leave with pay so they could look at it more closely. And isn't that exactly what you would want a school district to do if there was reason for concern? If this principal had been the one that had engaged in the wrongdoing, as has been the case in all prior due process cases, yes. But you're assuming the results. At that time, how can it be known what's going to happen at the end of the day? How can it be known what the result of the final hearing will be? I think what was going on, Your Honor, is that before Mr. Qualls was ever interviewed, before they set out this list of things that he had allegedly done wrong, the decision had already been made that we're going to get rid of Hugh Qualls. And I think what also has to be considered is the long-standing animosity that Mr. Daugherty, the then board president, and Mr. Qualls, I mean, Mr. Cook, had against Mr. Qualls. It was what I would say as a setup. It was a conspiracy to get rid of Mr. Qualls, no matter how it was going to turn out. And that's evidenced by the fact that after you're going to get rid of Mr. Daugherty. I'm sorry? I'm sorry. Even if it was biased, doesn't the Walker case suggest that the bias in an early hearing or early procedures is not significant as long as the termination hearing is unbiased as it was in this case? Well, the termination hearing, I don't have an issue that it was unbiased by the arbitrator. The problem with the termination hearing was that as it was proceeding, Mr. Cook kept bringing in new charges, new evidence. Right. But before that hearing, which no one is alleging was biased, however the procedures went on before the hearing, even if Mr. Cook was biased, doesn't the Walker case indicate that that doesn't raise or raise a due process concern? Well, not if the prejudice to the – you still have prejudice because of the unbiased proceeding, and that prejudice resulted because of the additional charges throughout the hearing. Ultimately, the arbitrator ended up finding three issues with Mr. Qualls, none of them which were in the original charge of January 6th of 2003. You're not answering the question that's posed. I think it's an important one. Doesn't Walker say that a problem with the bias at the first stage is completely resolved by an unbiased post-deprivation hearing? You have other complaints, perhaps, about the post-deprivation hearing. I'm not sure they're properly before us, but whatever those complaints are, doesn't  Well, Your Honor, respectfully, I don't believe that it does. Why not? Because if this process is infected from the beginning, and if this infection just permeates the whole process – Wait, wait, wait, wait. Just tell me if the process is infected from the beginning doesn't speak. Does Walker say what we're contending to you it says? Yes, Your Honor, it does. If it does, then doesn't Walker say an unbiased post-deprivation hearing cures the problem from the beginning? And if Walker says that, how can the answer be, but there was a problem at the beginning, if Walker says that it's cured by the post-deprivation hearing? The prior stuff may be cured, Your Honor, but there are still the prejudices that Mr. Quall suffered as a result of the hearing, because the hearing officer accepted three additional – Stop. That's a separate complaint. If you're saying, okay, Walker extinguishes all of those complaints about bias in November and so forth, that's fine. We'll talk about this separate issue. But if you're not prepared to say that first part, I'm still waiting to find out why the main thrust of your case isn't out the window. Yes. From my perspective, Your Honor, the way that I'm looking at this case is that there's a problem all along, and it's not completely extinguished, even with the arbitration that went on. I mean, it went on for five days because we kept getting new charges that we had to address. And at the end of it, Mr. Quall still suffered detriment. So I don't believe that it was completely extinguished. That continued on throughout this process. After the arbitration hearing concluded, and it concluded for the most part in Mr. Quall's favor, and none of the charges that had originally been made against him had been sustained, Mr. Cook pursued and continued to seek Mr. Quall's dismissal. Again, just furthering that this was not done for a governmental purpose, Your Honor. And also it wasn't accomplished. I mean, I've got to say, I've got a sense of this from both sides, that what we have here is an ongoing feud between Mr. Quall and Mr. Cook. I don't know how that becomes a 1983 action in this context. I think the deprivation of the property interest that he had in his position, and I understand that the district court viewed it as slight because he had received pay during the time that he was suspended, but that doesn't consider the fact that he had to pay in order to get his pay. He had to post a cash bond. Well, that's the second time. That's in January. I mean, the first was administrative leave with pay. The second, suspension without pay but for his posting of a bond. And there is money out of his pocket there. There is that. In addition to the fact that he also had to pay nearly $50,000 to try to preserve his job on a basis of nothing other than personal animosity, the statute requires the superintendent to go through certain processes in order to suspend somebody immediately. He had to show that there was cause for dismissal and a reason to believe that the immediate suspension was in the best interest of the students of the district. I don't believe he showed that at any point. He knew that there was no cause for dismissal. Where did those requirements come from? From NRS 391314. So that's a cause of action presumably that could be pursued under the State statute. Well, that's the statute that provides the due process rights to Mr. Cook, I mean, Mr. Qualms. In that respect, Your Honor, I'm going to reserve the rest of my time. Let me ask you a question, counsel. We have in the excerpt of record a document that's called Summary of Interviews, Mineral County School District, November 7, 2002. It was apparently an exhibit to a deposition. Was it ever introduced in any hearings? Did Mr. Qualms have a copy of it? It just seems to appear magically, and I don't know. No, Your Honor, he didn't have a copy of it. He did or did not? He did not. Well, how was it used? Was it introduced at the hearing or? After we came back, after the Federal lawsuit was filed, Mineral County School District produced a lot of documentation that was apparently part of it. When I first got involved in the case, I asked for the Bella report, and I was denied that because they claimed it was attorney-client document. In the letters that Mr. Qualms received, at no time, as he said, as he told, these are the charges against you, and this is the evidence against you, he's basically told these are the charges, and we're going to go ahead to a dismissal hearing. So with that, if Your Honor has no other questions, I'd like to reserve the rest of my time. Thank you. May it please the Court, my name is Brent Colbert. I represent the Mineral County School District. It is the district's position that this particular case is one which was properly disposed of by the district court through summary judgment because, in fact, due process was afforded, was provided to Mr. Qualms, and the process, in essence, worked. As this Court has already noted in some of its questioning, the end result in this case was that Mr. Qualms was given back his duties as principal of the two schools he was principal of. He was never terminated. That, I think, is an important point. Mr. Qualms, his duties were suspended, but he personally was never terminated as a principal for Mineral County School. Instead, what happened was that on November 7th, he was suspended with pay pending the outcome of this investigation. On November 7th, there was an investigation ongoing into some very serious charges that resulted in a or that were, in essence, criminal in nature, in that a 19-year-old boy had sexual relations with an underage female student on the premises of the school that Mr. Qualms was charged with administering. Mr. Qualms takes the position in this case that it wasn't my job, in essence. If you believe his argument, it's because he wasn't the principal of the high school. These were high school students on his campus, but it wasn't my job. That was somebody else's job. He also takes the position that during that period of time, he had no knowledge, pre-knowledge, that there was any concern regarding this particular 19-year-old student. He argues, in essence, that the November 7th suspension was unwarranted because there was no proof of any wrongdoing by Mr. Qualms. And counsel has already cited the fact that, or what she claims is fact, that Mr. Cook has acknowledged that there was no wrongdoing. What Mr. Cook actually said was, there was nothing that I could proceed with at that point. However, the evidence was pointing in that direction by November 7th. And what that evidence consisted of was statements by principally the high school principal, Mr. Baker, and another individual who had knowledge of Mr. Burbank, the 19-year-old. Both of them have statements which Mr. Qualms now denies. But the first one was by another teacher who said that you better watch Mr. Burbank. He's a predator. Mr. Qualms has not denied it. Now, that was by, who made that remark? I'm trying to remember his name off the top of my head. Well, this is very critical. Who said what when? I understand, Your Honor. And I'll, if I could sit down. Mr. Capolari, I think. Capriola. Capriola, sorry. He was a teacher who had some knowledge of this particular boy. And the hearing officer, in his hearing summary when he made his findings, indicated that he did not find Mr. Capriola believable because of some other issues. But Mr. Qualms does not deny that he had the conversation with Mr. Capriola. He does not deny that it occurred prior to this incident occurring in the lunchroom. He doesn't remember the use of the word predator specifically, but he does, in fact, recall and acknowledge that Mr. Capriola expressed to him concern about a 19-year-old being in contact with younger female students. And the other part of that is that while Mr. Capriola is found by the hearing officer not to be particularly believable because of some other issues, the fact remains he was right in this instance, wasn't he? And if he was, even exaggerating, is it not the responsibility of the person in charge of that facility to make sure that there is no problem, not just assume that there will be no problem? And that was a concern, I think, in this case as well for Mr. Cook when all this evidence is presented to him, and also the hearing, the investigator, Mr. Scott, whose report was relied on by Mr. Cook in making some of the decisions in this case. Could you address the point that the report by Beller and Associates wasn't truly independent because it was a stage managed, as it were, by Mr. Cook? Certainly. I had a couple of problems with that conclusion, and that was a conclusion the hearing officer reached and one that counsel has continually pursued in this case. The basis the hearing officer found for it not to be independent was that Beller and Associates, in particular Mr. Scott, had prior to this, sometime prior to, had done some instructional seminars or meetings with the school district in which they went over what sexual harassment was, both in the employment place and in the school, and that that was somehow not an independent third party when they showed up on the scene to do this investigation. The second part of it was that Mr. Cook apparently had contact with Mr. Scott throughout the investigation, and there was contact. There was assistance given to Mr. Scott by Mr. Cook in arranging for interviews. He did not actually participate in the interviews. He made arrangements for persons that Mr. Scott was interested in meeting with and talking to to come in and do that. The investigation consisted of these interviews being tape recorded so that there was no question as to what the questions were or the answers given to the questions. There was a procedure in place which basically was an attempt to be a fact finder. Now, the conclusions at the end of the day that were drawn, and I didn't get to Mr. Baker yet, but I'll use that as an example now. The hearing officer specifically found that Mr. Quall seemed to be somewhat credible, but that Mr. Baker, for example, had to have been mistaken. And he does a jump of logic that you just can't go to in these kinds of cases. He ignores, for example, the fact that Mr. Quall says every reason to fabricate information at that point. I may be a little lost here. We're talking now about the hearing officer at the post-deprivation hearing. Right. And you're, in effect, challenging the conclusions that he reached. I am not challenging them. We did not challenge them officially, and they've got to stand as they are. What I'm suggesting is that this gives an example of why Mr. Scott's report and conclusions was not biased by his contact with Mr. Cook. That was the question I was trying to respond to. I'm sorry, Your Honor. I just want to make certain I was focusing on the right time period. That is it, Your Honor. What I'm suggesting is that when you look at the hearing officer's findings, you find that he believes that Qualls was mistaken about what Mr. Baker referred to. And this is a key ingredient or key component of why Mr. Qualls was suspended for falsifying statements. In Mr. Cook's view, despite what the hearing officer ultimately determined about this set of circumstances, the facts were that Mr. Baker supposedly called Mr. Qualls in October 16th or 17th and said the sheriff's office wants to meet with you to talk about an incident that occurred on your campus where a 19-year-old is accused of having sex with a 14-year-old. And at that point, according to Mr. Baker, Mr. Qualls' response was that couldn't have happened. I was supervising him. There's no way that happened. I heard about it two weeks ago, and it just didn't happen. Now, later, on the 21st of October, when Mr. Cook asked Mr. Qualls to give him an explanation as to those, that statement and the rumors he referred to in those statements, it's now suddenly that Mr. Burbank came to him with some letters or about some letters or comments that were going around, and he wanted to know what to do about it. Now that the problem has surfaced and the issue has become focused on the fact that there was this illicit activity going on on his campus, it now changes. Now, Mr. Baker's statement is never challenged specifically. It's put off as being some kind of misunderstanding between the two. But Mr. Cook had that information. That was what Mr. Scott elicited during the interviews. That's the information he had. So at that point, what I'm trying to suggest is that Mr. Cook, looking at everything he had in front of him, had ample grounds to suspect that there was more to what Mr. Qualls' involvement was and pre-knowledge in this case than has been alluded to here, and that at that time he was well within the provisions under Chapter 319 of the Nevada Revised Statutes to do what he did in issuing the suspension order pending the outcome of that investigation on November 7th. I know what you're saying, and you may well be right, but a summary judgment isn't the time to decide whose story is correct. I am not suggesting it was. The issue that has been raised here is that Mr. Cook had this animosity and that that somehow affected the investigation that Mr. Scott conducted, and therefore there was no proper investigation. I'm merely pointing out some things that go the other side of that. And I'm not suggesting that we go beyond the investigation or the findings of the hearing officer, because we did not challenge those. We did not appeal those. The school district accepted those findings, and I'm here to accept them today. Counsel, let me turn your attention to something else. Let's say that the suspension with pay was justified because of the report or whatever was going on, but then they decide that they're going to suspend him without pay and then terminate him. So at that point, Burbank is long gone. There's no crisis at the school. And ordinarily, when you then say no more pay, you conduct some kind of a further notice and hearing and opportunity. It seems to me that at that point, the school district didn't have any concern about the safety of the students, didn't have any concern about the administration of the school. Why didn't they proceed to give him notice and say, these are the charges. Let's have a hearing if you want one. And at the conclusion of that, whatever came out of it then would be the time to terminate the pay. There was no real crisis at the point that the school district decided to. Could some other process have been followed? Certainly. That scenario, though, was more or less followed that you just outlined. What happened was Mr. No, they told him no more pay, fella. Well, they did. They gave him the opportunity for a hearing and an opportunity under the statute to continue to receive his salary, which is provided for in Chapter 319. The superintendent, first of all, is the one issuing that particular letter. And under 319, he has no power to terminate Mr. Qualls. He has the ability to recommend to the school board, who is the ultimate determiner of that, that he be terminated. That's what he did in that letter. He told Mr. Qualls that I'm going to recommend to the school board that you be terminated pending the process that's in place under Chapter 319. I'm going to place you on leave without pay. However, you can continue to receive pay if you post the bond. The statute provides for that process. So we understand that, but the court. But he also told him he had a hearing that he could have. And if he requested a hearing, one would be had before the official effect of any further proceedings would go forward. He took advantage of that. As a result of that, he was re-given his duties. But I guess that that's the point at which one might suggest that the action of the school was a little overplayed, because he was on leave, nothing happening. Just go ahead and say, I'm going to give you notice. These are the charges. Let's have a hearing. And at the end of the day, then terminate the pay. Of course, at that time and by that time, he was already been out of his duties had been already suspended for a period of time. Absolutely. That's part of my point. Didn't change anything with respect to him at that point. Secondly, a lot of the delay between. Cut off money. I mean, well, he was he's out some money, which is the district court found was. I think that's the thrust of Judge Fletcher's question. Nothing else seems to require taking the step of cutting off money at that point. Yet money is cut off. Is that a due process violation? If I would, I would submit to you that it is not because there's no deprivation at that point of anything. Except some small money. Surely a deprivation. But except for some small amount of money, nothing else has changed in the status. And secondly, the trial court found that was not a significant deprivation. And then on top of that, when you do the balancing test under Matthews, you you have to weigh that against some other issues. And one of the things the trial court found and one of the things we argued was that this particular individual was a principal in a school where a crime had been committed on his watch, a very serious kind of crime, one that required some action from the school district to ensure that the parents in that district could trust their school district. They had to do something. That was the view they had. Now, whether they did it right or took the right course, one could argue. One could look back today and say it didn't. But the district in the end did not fire him. He was never terminated. He never lost his position. He lost his duties for a period of time. But the district gave him the process. And I'm way over time on what my colleague needs some time to address. I understand you might want to sit down. Thank you. May it please the Court. My name is David Lockie, and I'm from Elko, Nevada. I'm representing Stephen Cook, who is the school superintendent. As the Court was able to ascertain from our briefs, the issues are nearly identical. The primary difference, at least raised in our briefs, was the issue of qualified immunity, which the district court never reached. The statute at hand, which is 391.014, does vest the school superintendent with wide discretion. If the school superintendent believes that there is good cause to do so and thinks it's in the best interest of the school to place someone on administrative leave, which he did so. The statute further provides a basis for and grounds for dismissal under 391.312. And there were a whole host of things that at least Mr. Cook perceived that Mr. Qualls had done or failed to do that justified his dismissal. It is not an unusual process with regard to school employees if a person is facing dismissal proceedings to be placed outside the school until that hearing happens. Now, that hearing can happen very fast or it can take a while. But the record is clear in this case that all of the hearing dates were mutually agreed upon between counsel. So the time that he was off is not relevant here at all, that he was off after. I just want to make sure I understand what the thrust of your argument is. Are you raising a qualified immunity argument here or are you back on the main issue? No. I just wanted to inform this Court that everything that Mr. Colvett said pertains to what I say. We never got to the qualified immunity. But I would suggest that if this Court were to overlay some requirements with regard to 391.014, there certainly would be qualified immunity, because the law wouldn't be well established at that point. In other words, the statute was followed to the letter, the statute itself. In any event, the notice was clearly given to Mr. Qualls in writing. In the proper form and consistent with the statute. Also informing him of all of his rights. Now, there was some considerable time between when he received that notice and the hearing date was convened. And he received a five-day hearing. But the evidence is undisputed that the dates were agreed upon between counsel for that hearing. Counsel, there's nothing in the record to show me whether the school district gave Mr. Qualls a copy of the report. It appears that he got a copy of the report, but how did that happen? I'm uncertain. I know that he did have a copy of it. I don't know the answer to that, Your Honor. We're aware that he did have a copy of it, and I did not explore the means by which he obtained that. Do you know anything about this summary of interviews, whether he ever got a copy of that? I believe that the evidence in this case does show that he did. Specifically, well, on September 25, 2002, this Mr. Capriola, who the hearing officer later on discredited his testimony, Mr. Capriola indicated that Bishop was not appropriate to be around young girls in the cafeteria and that he was a predator. And once again ---- You don't mean Bishop. You mean ---- I'm sorry. I meant Capriola. Mr. Capriola, on September 25th, informed ---- Capriola informed Principal Hugh Qualls that placing Burbank in the cafeteria is a problem. He explained that Burbank is hanging around special education girls and this girl who was sexually assaulted was a special education girl after school and waiting for them off campus. Okay? So, clearly, as early as September 25th, Qualls is on some notice. As Mr. Colvin indicated, on October 16th, when Qualls is also confronted with this on my watch, he completely discounted the possibility that anything could have happened when, in fact, it did happen. The essence of this case, though, is, again, that the Nevada statutes are consistent with what due process requires, that is, that he receive adequate notice of the charges against him and that he be afforded a hearing. He had a hearing at mutually convenient dates. Mr. Qualls' testimony is that he has no quibble with the manner in which the hearing was conducted and that appears at volume three of the record at 636. Qualls testified that he felt, that Qualls felt that the hearing process was fair. That's volume three, ER 637. So he got all of the due process that one might imagine a person could get. And we thank you for your time. Thank you. Ms. Mercado? You know, I would be helped if you could succinctly state what the disputed facts for decision here are so that summary judgment should not have been granted. If you have to do that, Your Honor. I think we begin with the judge's order lays out the facts in the light most favorable to the defense. Beginning with the statement that Mr. Qualls was the site administrator and therefore everything fell on him. But the testimony from Mr. Qualls was just different, to some extent slightly different, that Mr. Baker, who is the principal of the high school, has responsibility for his students. He was aware that the school had come in late from lunch at one point but did nothing. He was aware that there had been a dating relationship and did nothing. But it didn't, that didn't matter. It was the cafeteria. So that was that aspect of it. When they say that. Excuse me. Is he disputing that he was the site administrator? He administered the cafeteria. That didn't necessarily make him the supervisor of the high school students. The policy and practice had been that the high school principal takes responsibility for the high school students, even when they're on the school cafeteria. And that was shifted to Mr. Qualls and away from Mr. Baker, who also worked with Mr. Cook. That there was some dispute, Your Honor, with regard to if he got notice at every stage, including at the very beginning when he was first given notice of the November 7th that there was a problem. Well, the November 7th letter didn't tell him this is what you've done wrong, this is the evidence against you, and you have an opportunity to respond. He was handed a letter and said, get your keys, give me your keys, and walked out. Mr. Cook says, oh, and I explained to him what was going on, and I gave him the letter. Mr. Qualls says, no, that didn't happen. They gave me the letter. I'm handing out grades to parents, and they walked me out. That was the other dispute. When we get to the, his opportunity to address the board after the Veller investigation came out, that was incorrect. He did not get an opportunity to address the board. He asked for an opportunity to address the board, but that was denied him. Basically, nobody responded to him. You ask the question, Your Honor, did he have a copy of the report? He got a copy of the report, but the district didn't give it to him. When we began the hearings, they wouldn't give it to us. I mean, that was an issue that was addressed by the hearing officer, and ultimately we got it in discovery in this case formally, but you're right. Mr. Qualls had ultimately obtained it. Now, when he got notice in January, again, the district court says, well, he knew in January that these were the charges against him, and he had an opportunity to respond. Again, if you look at the January 6th letter, he's told these are the charges, but due process requires that he be provided with an explanation of the evidence given against him. He was not provided with that. He was just told these are the charges and go ahead and invoke your rights to a hearing under the statute. The point that you raised earlier, Your Honor, and I think is well taken and very important in this case, is that if the board had simply said, we want to hear what you have to say now that Steve Cook is looking for your termination, all Mr. Qualls asked for is an opportunity to speak to the board. And that's in his letter of January 4th. He doesn't do a blow-by-blow. These are the problems with the Bell report, which is what the district court says. He had an opportunity to address the concerns in the report. That's not what he did. He asked the board. He says there's a problem with this report. I want an opportunity to speak to you. Nothing happened. Instead of doing that and avoiding five months of misery and the expense attendant to both Mr. Qualls and the school district, they just went on with this full board hearing. Well, what establishes that it's due process or a violation of due process to deny that meeting with the board? Well, the opportunity to respond, Your Honor. The statute sets up a procedure. The procedure leads to a hearing. You're suggesting the board should have gotten involved rather than let the statute go forward. I think a brief pre-termination or pre-suspension hearing, not a hearing, a board meeting would have been appropriate. Just that's the thing. It might have been appropriate. It surely would have been appropriate. But what makes that a requirement of due process? Again, to have the opportunity to respond, because he didn't know what the charges were against him. He didn't know what the evidence was against him. Thank you, Your Honor. The case is submitted.
judges: B. Fletcher, Clifton, Ikuta